IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DELOIS NICHOLS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 12 C 9183 |
| CAROLYN W. COLVIN, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

An Social Security Administration (SSA) administrative law judge (ALJ) denied Delois Nichols' claim for supplemental security income benefits (SSI), finding she was not disabled. Nichols has appealed the decision. Both Nichols and the Commissioner of Social Security have moved for summary judgment. For the reasons stated below, the Court grants Nichols' motion, denies the Commissioner's motion, and remands the case to the SSA for further consideration.

### Background

Nichols filed her application for SSI benefits in August 2009. She stated that she suffered from depression, asthma, back problems, arthritis in her knees and shoulder, and headaches, all of which she said had interfered with her ability to work since July 2002. She also stated that she stopped working as a home care provider in April 2006 after falling and breaking her shoulder.

The SSA first denied Nichols' application in December 2009 and did so again in September 2010. Nichols requested a hearing on her claim before an ALJ; the hearing took place in May 2011 in Chicago. Nichols testified at the hearing, answering questions from both the ALJ and her own attorney, followed by testimony from a vocational expert. Two months later, the ALJ issued his decision that Nichols had not been under a disability since the date of her application. In September 2012, the SSA's Appeals Council declined to review the ALJ's decision, making the ALJ's decision the final commission of the Commissioner. R. 1.[1]

In his opinion, the ALJ applied the five-step sequential evaluation process outlined in the applicable Social Security regulations to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a). At step one, the ALJ determined Nichols had not performed substantial gainful activity since the date of her application in 2009, although she had done some work that did not qualify as substantial and gainful. At step two, he concluded that Nichols had impairments qualifying as severe under 20 C.F.R. § 416.920(c): affective mood disorder, history of anxiety-related disorder, asthma, arthritis, and substance abuse.

At step three, the ALJ found that Nichols' impairments did not "meet[ ] or medically equal[ ] one of the listed impairments" in 20 C.F.R. § 404, Subpart P, Appendix 1. R. 25. For physical impairments, the ALJ reported "that all of the listings under the Listing of Impairments were reviewed and considered in conjunction with the entire record," *id.*, specifically referencing Sections 3.03 (asthma), 1.02 (major

---

[1] The parties disagree in their memoranda about how to cite to the record in this case. The Court will cite to the large, bold, sans serif numbering in the bottom right corner of each page of the file of the Certified Copy of Administrative Record (dkt. no. 12).

dysfunction of a joint), and 1.04 (disorders of the spine). He found that Nichols' ailments in these areas did "not approach the level of severity set forth in any section of the Listings of Impairments." *Id.*

As for Nichols' mental impairments, the ALJ concluded that they did "not meet or medically equal the criteria of listings 12.04, 12.06, and 12.09." *Id.* at 26. In this regard, the ALJ considered whether "paragraph B" criteria were satisfied. Each of the subsections of Part 12 of Appendix 1, including 12.04, 12.06, and 12.09,[2] has a paragraph B requiring that the claimant's disabilities result in at least two of the following:

    1.    Marked restriction of activities of daily living; or

    2.    Marked difficulties in maintaining social functioning; or

    3.    Marked difficulties in maintaining concentration, persistence, or pace; or

    4.    Repeated episodes of decompensation, each of extended duration.

The ALJ found that Nichols had a mild restriction in her daily living activities, moderate difficulties in social functioning and concentration, persistence, or pace, and found in the record no episodes of decompensation of extended duration.

The ALJ next found that the evidence in Nichols' case also failed to meet the "paragraph C" criteria. There is a paragraph C in subsections 12.04 and 12.06 listing factors an ALJ can consider instead of the paragraph B factors; he found that Nichols' record contained "no medically documented history . . . of repeated episodes of decompensation, residual disease process resulting in marginal adjustment, or a current

---

[2] Subsection 12.04 is entitled "Affective Disorders." Subsection 12.06 is entitled "Anxiety Related Disorders." Section 12.09 is entitled "Substance Addiction Disorders."

history of inability to function outside a highly supportive living arrangement." *Id.* at 26–27.

The ALJ went on to consider step 4, which requires him to assess Nichols' residual functional capacity (RFC) and past relevant work. He concluded that Nichols had the RFC "to perform a range of light work as defined in 20 CFR 416.967(b)." *Id.* "Specifically," he wrote,

> the claimant can lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk for about 6 hours in an 8-hour workday, and sit for about 6 hours in an 8-hour workday with normal rest periods. She is unable to work at heights or frequently climb ladders or stairs. . . . [T]he claimant would be unable to understand, remember, and carry out detailed and complex job instructions. She is not suited for work that requires intense focus and concentration for extended periods. She may interact only occasionally with the general public. Additionally, the claimant can only occasionally reach overhead with the non-dominant left upper extremity.

*Id.* at 27.

To reach this assessment at step four, the ALJ concluded that although Nichols' medically determinable impairments could reasonably cause her alleged symptoms, her "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *Id.* at 28. To reach this finding, he made several factual determinations. First, he reviewed many of Nichols' own statements about her symptoms, activities, and abilities from various interviews and from the hearing before the ALJ. He then pointed out several inconsistencies in Nichols' past statements about her abstinence from drugs, and noted that her reports of hallucinations varied in different interviews. He proceeded to state that Nichols "is capable of a range of 'light' exertional work," *id.* at 29, citing for his finding two reports from consultative

examinations performed in November 2009 and June 2010 for the Bureau of Disability Determination Services. *See id.* at 279–87; 372–75. The ALJ also evaluated Nichols' mental wellness history, tracking her reported drug and alcohol use and general demeanor from April 2010, when she "beg[a]n seeking persistent therapy," through April 2011. *Id.* at 29–30. He again noted the June 2010 consultative examination, where Nichols had normal memory, appearance, judgment, and behavior, and "was appropriate, polite, pleasant, and cooperative." *Id.* at 30. In all, the ALJ concluded, Nichols had "experienced significant improvement" with treatment. *Id.*

In addition to these findings at step four, the ALJ also discussed the weight he assigned to various medical opinions in the record regarding Nichols' physical and mental limitations. First, he noted that he "assign[ed] significant weight" to the mental and physical assessments of the SSA's Disability Determination Services (DDS). R. 30. He did not explain why he gave these assessments "significant weight" but went on to note that he assigned only "some weight" to the DDS opinion that Nichols was capable of "medium" exertion. *Id.* Accordingly, he "further reduce[d] the claimant to a range of 'light' work to provide her with every benefit and consideration." *Id.* He also considered the assessment of Naveed Mallick, who treated Nichols for asthma, substance abuse, and dental problems. He "assign[ed] some weight" to Mallick's opinion, "because it is not wholly inconsistent with the medical evidence of record." *Id.* at 30–31.

The ALJ also mentioned the conclusions of Dr. Nelda Scott, who treated Nichols at Stroger Hospital. He noted Scott reported that Nichols had PTSD, episodic cocaine abuse, and "rule out bipolar disorder," along with mild to moderate daily living limitations, moderate to marked social functioning limitations in social functioning, and

5

moderate limitations in concentration, persistence, or pace.  *Id.* at 31.  He stated that Scott said Nichols "was easily irritated and just restarting treatment."  *Id.*  The ALJ did not indicate what weight he assigned to Scott's assessment, stating only that he had "considered" it.  *Id.*  "[H]owever," he wrote, "I note that Dr. Scott only briefly treated the claimant and her opinion is based on the claimant's state prior to beginning significant treatment."  *Id.*  Yet "[a]s set forth above, the claimant experienced significant improvement with treatment."  *Id.*

Aside from these opinions, at no point in this discussion did the ALJ mention by name the reports of Dr. Raasheen Roberts, Dr. Patricia Favia, and Jeremy Raven, a qualified mental health professional, who saw Nichols at Woodlawn Mental Health Center from July 2010 through at least April 2011.[3]  The ALJ did mention the opinions of "[t]he claimant's therapist," an individual he did not name, noting that he gave this unnamed person's opinion "no weight."  *Id.* at 31 (citing R. 414, 418–19).  The ALJ noted that the therapist "simply listed quotes from the claimant," but somehow "opined that the claimant is unable to work."  *Id.* at 31.  He gave no weight to the therapist's opinion because it was inconsistent with Nichols' treatment records and with her "self-reports of improvement with medication in April 2011."  *Id.*  (The undated report, which appears to be an intake document, was likely from Woodlawn Mental Health Center, as it appears in the record after a letter from Nichols' attorney stating that Woodlawn records are attached.  Nonetheless, no name for the therapist or treatment facility is denoted; on the first page, someone has written "Therapist."  *See id.* at 413–20.

---

[3] At one point, the ALJ did refer by exhibit number to a report by Roberts.  *See* R. 29–30 (citing Exhibit 23F/35, 41, corresponding to R. 472, 478).  At no point, however, did he discuss what weight he gave this report relative to those of Scott or any other treating or consultative physician.

6

However, in response to one prompt on the report, the author wrote, "This writer, not a physician, can't evaluate," and also checked "no" in response to the question, "Are you treating these conditions?" *Id.* at 420.)

After discussing these points, the ALJ proceeded to find that although Nichols was unable to perform any of her past relevant work as a home care aide with the RFC he had assigned to her, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." *Id.* at 31, 32. Here, he considered the RFC assessment, as well as Nichols' age, education and work experience, and also the Medical-Vocational Guidelines described in 20 C.F.R. § 404, Subpart P, Appendix 2. The ALJ also drew on the testimony of the vocational expert at the hearing, who testified that Nichols could work as a laundry sorter, cafeteria attendant, or housekeeping cleaner. Given that opinion, the ALJ concluded that Nichols "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and thus was not disabled. *Id.* at 32.

## Discussion

A reviewing court should "uphold the Commissioner's final decision if the ALJ applied the correct legal standards and supported her decision with substantial evidence." *Bates v. Colvin*, 736 F.3d 1093, 1097 (7th Cir. 2013). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361–62 (7th Cir. 2013). A court must take care not to "reweigh the evidence or substitute [its] own judgment for that of the ALJ; if reasonable minds can differ over whether the applicant is disabled, we must uphold the decision under review." *Shideler v. Astrue*, 688 F.3d 306,

310 (7th Cir. 2012). But "as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

Nichols contends that the ALJ failed to provide a complete explanation of his decision, selectively used evidence to support his conclusion, and ignored or downplayed the opinions of physicians who treated her in favor of those who did not. The Commissioner argues that the ALJ's failure to address a global assessment of functioning (GAF) score that one of Nichols' doctors assigned to her was harmless error. She proceeds to address many of Nichols' other arguments one by one, arguing in summary that they are "skeletal" and "lacking reference to the record." Def.'s Mem. at 6. Overall, the Commissioner contends, "[w]e by-in-large [sic] do not address Nichols' boilerplate assertions, unsupported by citation to the record, as they are waived." *Id.*

1.  **Consideration of medical opinions**

Nichols argues that the ALJ failed to explain "why the treating doctor and Social Security's Consultative Specialist's opinions were not given appropriate weight, except for when he substituted his own opinion." Pl.'s Mem. at 11. Elsewhere in the brief, she specifies the treating doctors to whom she is referring: Dr. Raasheen Roberts at Woodlawn Mental Health Center, "her treating physician," *id.* at 4, and Dr. Nelda Scott of Stroger Hospital, who evaluated Nichols' mental health. Nichols contends that "[t]he opinion of treating doctors must be given special deference," and she says the ALJ "completely ignored" the treating doctors and a consultative opinion in favor of "two non-

examining, non-treating doctors who only reviewed some unspecified part of the record." *Id.* at 14–15. (She does not name these two latter doctors or provide citations to their reports in the record.)

The Commissioner places emphasis on the fact that the ALJ did not mention GAF scores Scott had assigned to Nichols throughout her treatment, noting that Scott did not change the score with each diagnosis (it was consistently "45–50," see R. 363, 485, 492, 509, 513). She argues that Nichols hasn't explained the significance of GAF scores and that a GAF score "is not necessarily a functional assessment, and is thus not determinative." Def.'s Br. at 5. The Commissioner also notes that the ALJ cited a *different* GAF score of 60 from a different doctor in the record, and that Dr. Kirk Boyenga, whose opinion the ALJ gave "significant weight," R. 30, "mention[ed]" a GAF rating from Scott. Def.'s Br. at 5–6. Otherwise, the Commissioner contends that Nichols' argument about the ALJ's distribution of weight to various medical opinions "is entirely boilerplate" and "neither cites to the record nor discusses any particular exhibits." *Id.* at 9.

"An ALJ must consider all medical opinions in the record." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). Although it is the ALJ's job to determine whether an applicant is "sufficiently disabled to qualify for social security disability benefits," the Seventh Circuit has observed that "the answer to the question depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored." *Garcia v. Colvin*, No. 13-2120, 2013 WL 6698045, at *2 (7th Cir. Dec. 20, 2013). In that regard, the ALJ must give "controlling weight" to the opinions of a "treating source," provided that "they were

supported by medical findings and consistent with substantial evidence in the record." *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). An ALJ's choice not to assign controlling weight to a treating physician's opinion requires him to "articulate sufficient reasons for not doing so." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). An ALJ's failure to explain why he might have given controlling weight to one assessment over others is subject to harmless error review. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (per curiam).

The Commissioner treats the ALJ's failure to address Scott's GAF scores as Nichols' primary argument, although it is only part of Nichols' contention about the ALJ's consideration of treating doctors' medical opinions. Although the Commissioner is correct that the ALJ cited one instance in which Nichols received a GAF score of 60, that is the sole mention of GAF scores in the entire decision. This raises the question of why, if he considered GAF scores to be relevant (as he appears to have done), the ALJ did not consider or at least mention the other scores, let alone what weight he assigned to them. The Commissioner is also mistaken when she contends that Nichols has not explained why GAF scores are significant. In her opening brief, Nichols cited the DSM-IV-TR manual to explain that a "score of 50 indicates 'serious symptoms' (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job)." Pl.'s Mem. at 3 n.1. These assessments by Nichols' treating doctor are significant, and they cannot simply be ignored.

The Commissioner is correct that Boyenga's report in the record does make mention of Scott's GAF scores for Nichols. But the Commissioner's statement that "the

ALJ gave Dr. Boyenga's opinion 'significant' weight" is misleading.  *See* Def.'s Mem. at 6.  Although the ALJ did assign "significant" weight to one of Boyenga's reports, see R. 30, it was not the Boyenga report that mentioned Scott's GAF score.  *Compare id.* at 387–400 (Boyenga "Psychiatric Review Technique" report, which mentions Scott's GAF diagnosis of 50 but which the ALJ did not cite, Record exhibit no. 19F), *with id.* at 409–11 (Boyenga report that ALJ cited, Record exhibit no. 21F).  Regardless, given the absence of any explanation in his decision, there is no way to know whether the ALJ considered or even saw the GAF scores of 45 to 50 that Scott determined based on her assessment of Nichols.  Though the ALJ may have relied on one report by Boyenga, there is no indication that he himself considered prior GAF scores, and the Court must steer clear of considering rationales the ALJ did not employ in his opinion.  Doing so would violate the *Chenery* doctrine, under which a reviewing court may not uphold an administrative order "unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  The Court must judge an agency's action solely on the grounds the agency invoked, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), a principal applicable in Social Security decisions.  *See, e.g.*, *Roddy*, 705 F.3d at 637 ("[T]he Commissioner cannot defend the ALJ's decision using this rationale directly, or by invoking an overly broad conception of harmless error, because the ALJ did not employ the rationale in his opinion.").

Beyond GAF scores, Nichols argues that the ALJ did not give appropriate deference to her treating physicians or explain adequately why he declined to do so.  The Court agrees.  To begin with, the ALJ did not explain why he assigned "significant

weight" to the opinions of the Disability Determination Services assessments, the greatest weight he gave to any opinion in the record. As for the opinions of Scott, who treated Nichols regularly in 2010, the ALJ mischaracterized Scott's treatment relationship with Nichols or at least omitted a complete description of it. The ALJ qualified the value of Scott's assessments by noting that Scott had only "briefly treated" Nichols and that "her opinion is based on the claimant's state prior to beginning significant treatment." R. 31. But a perusal of the record reveals that Nichols began treatment in April 2010 and that Scott saw Nichols both during that month and multiple times afterward throughout the year. The ALJ incorrectly stated that Scott had treated Nichols twice; she saw Nichols at least five times in 2010 alone. *See, e.g.*, R. 363, 485, 492, 509, 513. Further, as noted above, the ALJ failed to mention parts of the assessments Scott had made of Nichols' condition, specifically the GAF scores she assigned to Nichols. Finally, the ALJ did not say what weight he had given to Scott's assessments, stating only that he had "considered" them. R. 31. Failing to give controlling weight to a treating physician's opinion is permissible, but only if there is a "sound explanation." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). In this case there was none. Rather, though it appears that the ALJ did not consider Scott's opinion controlling, he failed to explain why.

As for the staff members who treated Nichols at Woodlawn, the ALJ did not mention their assessments by name or indicate what weight, if any, he gave those assessments in forming his own opinion. Although the ALJ at one point referred to Roberts' report of her treatment of Nichols at Woodlawn by record exhibit number, *see* R. 29–30 (referring to Exhibit 23F/29, 35, 41), he did not discuss it in his assessment of

various opinions, *see* R. 30–31. The same goes for the other treating physician at Woodlawn, Favia, as well as Raven, the Qualified Mental Health Professional listed as Nichols' "primary clinician." R. 482. Whether these reports would have confirmed the ALJ's determination or contradicted it, the ALJ was required to address them in his discussion of the opinion evidence.

**2.      The ALJ's use of evidence and his credibility determination**

Nichols argues that the ALJ's analysis of her credibility constituted "opaque boilerplate" and should thus be rejected. Pl.'s Mem. at 11. Specifically, she says that a passage of language in the ALJ's opinion mirrored a passage the Seventh Circuit critiqued in *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012), among other cases. The Commissioner counters that "the ALJ did not use the *Bjornson* template, or anything like it," and also that case law permits use of such a template so long as the ALJ also adequately explains his conclusions. Def.'s Mem. at 6–7. "Problem is, it is Nichols who is guilty of using boilerplate, not the ALJ," the Commissioner says. *Id.* at 6.

In *Bjornson*, the Seventh Circuit criticized the following "piece of opaque boilerplate" in an ALJ Social Security benefits opinion:

> After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*Bjornson*, 671 F.3d at 644. The court noted that it had previously criticized similar language in ALJ opinions on disability benefits, and it was troubled that the language "implie[d] that ability to work is determined first and is then used to determine the

claimant's credibility," which "gets things backwards." *Id.* at 645. The court concluded its discussion of the passage by warning the Social Security Administration to rethink "the utility and intelligibility of its 'templates,'" and it then proceeded to discuss the substance of the ALJ's credibility determination. *Id.* at 646. That said, the Seventh Circuit has made it clear that an ALJ's inclusion of a boilerplate passage like the one above in an opinion is not automatically fatal. "The use of boilerplate is innocuous when . . . the language is followed by an explanation for rejecting the claimant's testimony." *Schomas*, 732 F.3d at 708.

The ALJ's opinion in this case does contain a passage strikingly similar to the one the Seventh Circuit criticized in *Bjornson*:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

R. 28. Save for the word "could" instead of "would" in the *Bjornson* passage, the passages are essentially identical. This passage, however, was not the end of the ALJ's credibility discussion. Specifically, the ALJ continued by highlighting inconsistencies in Nichols' reports of drug use (or nonuse) and evidence of her normal physical abilities in some areas, in contrast with her own statements. *See* R. 28–29.

Although it is clear that the ALJ's decision did not rely solely on the boilerplate language for its credibility determination, the analysis supporting that determination requires scrutiny. Nichols argues that the ALJ improperly derived his conclusion about her RFC by giving weight to some of her household duties over some of her reported limitations. For example, "the ALJ here failed to explain why the fact Plaintiff can make

a sandwich 'trumps' the fact that Plaintiff burns food and cannot cook without supervision." Pl.'s Mem. at 13 (citing R. 52, 211–20). Nichols also points out that the Seventh Circuit has cautioned strongly against "casually equating" household chores with labor skills, *id.*, and she argues that the ALJ did exactly this when citing Nichols' enjoyment of television and ability to make a sandwich in finding she had only minor limitations in her daily activities. Nichols characterizes this as "cherry pick[ing]" her testimony, and she says the ALJ "only discussed those statements that favored his decision that she could work." Pl.'s Repl. at 2. The Commissioner does not respond directly to this argument. At one point, however, she contends that "activities are a regulatory element of credibility," citing 20 C.F.R. § 416.929(c)(3)(i), and she argues that "Nichols fails to show how the ALJ relied disproportionately on [her activities] in his decision." Def.'s Mem. at 8.

"[T]he standard of review employed for credibility determinations is extremely deferential," and a court may overturn an ALJ's credibility determination "only if it is patently wrong." *Bates*, 736 F.3d at 1098. Nonetheless, findings on a claimant's credibility must be supported by substantial evidence. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). Although "an ALJ need not mention every piece of evidence in her opinion, she cannot ignore a line of evidence that suggests a disability." *Bates*, 736 F.3d at 1098. The ALJ "cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The Commissioner is correct that 20 C.F.R. § 416.929(c)(3)(i) indicates that the SSA will consider a claimant's "daily activities" in looking at "[f]actors relevant to your symptoms, such as pain." However, the Seventh Circuit has also noted that

> [t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer. The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Bjornson*, 671 F.3d at 647. In another recent case, the Seventh Circuit called it "naiveté" for an ALJ to "equat[e] household chores to employment" and to "attach[ ] great weight to the applicant's ability to do laundry, take public transportation, and shop for groceries" in determining the applicant's credibility. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013). The court noted that a claimant must perform some basic activities, such as doing laundry and buying groceries, unless she can hire someone to do it for her. *Id.* at 279. In another case, the court observed that consideration of daily activities is permitted in Social Security regulations but criticized an ALJ for failing to consider "*how* [the claimant] carried out those activities," which "should be considered in the RFC assessment." *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008).

In his decision, the ALJ noted that he was required to make credibility findings on Nichols' statements about her symptoms that "are not substantiated by objective medical evidence." R. 27. He proceeded to cite several of Nichols' self-reported household activities and symptoms, pointing to an SSA questionnaire she completed in June 2010, highlighting that "she gets up, takes medicine, eats something, takes a bath, and goes to bed," and "can make sandwiches, frozen dinners, and boil foods," as well

as "do laundry wash dishes, and mop" and "travel independently and shop for food and personal things." *Id.* at 28. He noted that she likes music, television, bingo, and walking but also noted that she said her left side gives out when walking a lot. The ALJ then stated that a Social Security field office disability report on Nichols, which was taken in September 2009, said "NO LIMITATIONS OBSERVED." *Id.* (citing R. 154). The ALJ further cited some of Nichols' testimony from her May 2011 hearing before him, including the fact that she cannot use her left arm and uses a cane, interacts with people at Narcotics Anonymous Meetings, sees a psychiatrist for bipolar disorder, and becomes violent when people agitate her. *Id.* He also cited her statements from the hearing that she can carry five to ten pounds, walk half a block without her cane, sit for thirty to forty-five minutes, loves church and music, reads the Bible, and watches movies, and that she has a cell phone but no money to pay for transportation. He then stated that he did not find Nichols's statements credible, and proceeded to outline inconsistencies in her reports of drug use, hallucinations, and mobility in 2009 and 2010, along with her "improvement with treatment compliance." *Id.* at 28–29.

Some of the activities the ALJ cited appear to be among the same "household chores" that the Seventh Circuit has repeatedly warned ALJs not to consider in assessing RFC or at least to inquire further into how a claimant carries out the activities. In addition, the ALJ neglected or declined to cite passages from the same report and hearing providing context for or limitations on the activities he cited. For example, in the report, though Nichols indicated she can walk up to a block, she also said she has "to stop quite often" because of pain during rain or when her asthma flares up. *Id.* at 185. At the hearing, although she said she goes shopping, she said that "[t]hey take me to

17

the store," and that "somebody has to take me to the grocery store." *Id.* at 60, 59. These statements in particular appear to undercut the ALJ's statement that Nichols is able to "travel independently," which is apparently based on an answer from the June 2010 questionnaire where Nichols checked "yes" to the question of whether she can "go out alone." *See id.* at 26 (citing R. 184 (labeled in ALJ opinion as Exhibit 8E/4)). Her more detailed statements at the hearing either contradicted or clarified that answer. Nichols also said at the hearing that she cannot find addresses on her own and that she needs someone to tell her how to get there. *Id.* at 65. Nichols further stated in the report that she loses her breath when climbing stairs and that her cooking habits have changed because she once "almost burned up the house" when doing so. *Id.* at 183. Also, at the hearing, the ALJ asked Nichols whether she cooked for herself, and she responded, "No, I don't cook without supervision because I burn up stuff and I've been known to forget." R. 58.

Moreover, at no point in his decision did the ALJ discuss how the daily activities he cited, such as making food or shopping for groceries, figured into his credibility decision. Although he noted inconsistencies in Nichols' statements about her drug use and hallucinations, he did not indicate which, if any, of Nichols' statements about her activities were credible and which were not credible. One can speculate that he found *some* of them to be credible, but that does not make his reasoning clear. How the ALJ considered Nichols' purported daily activities in making his credibility determination is left unsaid, and there is no indication that he considered evidence in the record to the contrary. What is clear from Seventh Circuit precedent is that the household activities

he outlined, without more, have little place in an RFC determination, as they do not describe how Nichols or any other claimant would perform in workplace conditions.

For these reasons, the ALJ's determination regarding Nichols' credibility is inadequate under established standards. If, on remand, the ALJ that addresses Nichols' claim chooses to consider Nichols' reports about her activities in the home, the ALJ must take into account the entirety of what she said about those activities and must include an analysis of how the activities translate into actual working skills in his RFC and credibility assessments.

## Conclusion

For the foregoing reasons, the Court grants plaintiff's motion for summary judgment [docket no. 14] and denies the Commissioner's motion. The Clerk is directed to enter judgment remanding the case to the Social Security Administration for further proceedings consistent with this decision.

_____
          MATTHEW F. KENNELLY
          United States District Judge

Date: January 21, 2014